Terry v. Next Point Diversified Real Estate. Good morning. May it please the Court, my name is Maz Incibeti. I'm here on behalf of Next Point Diversified Real Estate Trust, the appellant, and the defendant-slash-counterclaimant down below. This appeal is really about whether a subordinated note holder in a rather complicated, admittedly structured financial product, a collateralized loan obligation, has any rights. There are notionally hundreds of billions of dollars of these products out there. The case was dismissed on 12B6 and 12C grounds, and by the time the motion was granted, we'd already finished discovery and even produced an expert report that substantiated our allegations. But the core argument coming from the other side was that even if all those allegations are true, even if all the allegations of self-dealing, of misappropriating opportunities, of extending out the life of the product, costing millions of dollars, even if all that's true, we don't have standing and we don't have a claim for tortious interference. I'd like to start with the tortious interference claim that got dismissed, because that's the one that we find most puzzling why it got dismissed. I don't think anybody denies that the notes are a contract between the holder, my client, and the issuer, which is the Cayman Island Company. Cayman Island Company gives over everything to a trustee, and the trustee is aided by a co-trustee, we allege is the two plaintiffs here, counterclaim defendants here. Under New York law, the only argument they made below was that there was no claim. And when we responded that the notes incorporated the terms of the indenture, which have all these different tests and all these different requirements of the collateral manager, the argument that came back was, well, no, the notes don't incorporate any of that. Our response to that, well, that's illusory. You would concede that your claim lives or dies on whether the notes were absorbed into the indenture? Yeah. I think for the tortious interference claim, if the notes don't incorporate the indenture terms, then I think it's going to be a hard slog for us to make out our tortious interference claim. I agree with that, Your Honor. But I think they do incorporate them. They specifically say the note holder is to look to the indenture for their rights, for example. And the indenture has a slew of different requirements and standards that they have to live by in order to create those rights, to create the payment structure that ends up giving the note holders something. Otherwise, someone who buys this note, if it has no requirements, you're not even entitled to payment. I think that sort of renders the whole thing absurd and, as we said, illusory. Tell me, I was a little bit unclear as to which provisions of the indenture, which specific provisions you believe were breached. Sure, Your Honor. So we had a list that we went through, and there I have sort of a cheat sheet here, but Section 7.1, 11.1, 13. Hold on a second. Oh, sorry. Go ahead. 7.1, 11.1, 13.1, and 12.2 and 12.3, for example. And what are those provisions? I don't have them right before me. Broadly, what are those provisions? They describe the various essential limitations on what the collateral manager can or can't do. Some things they have to do, some things they can't do. They can't extend out the life, you know, of the The quality control. Quality control. Yes, Your Honor. And it's the various different ones is what I just listed out for you as sort of the first element. I think what's abundantly clear for the torsus interference claim, though, is that it's not so clear that the note did not incorporate the terms of the indenture that this should have been dismissed on the 12b-6. But the indenture says, as I read it, and please correct me if I'm wrong, that the trustee lacks authority to take any legal action until there's an event of default. So that seems to me to be a rather broad limitation on, you know, the right to sue under this document. Because everybody concedes there was no event of default. Well, you know, first of all, they control whether or not there's an event of default. The indenture also says that the trustee can't declare an event of default unless collateral managers declared an event of default, which they're in control of. But I actually don't think that that provision even applies here, because Why not? Because it applies to the trustee taking action on the contract itself. And when you have a note that's just a standalone contract, there's nothing that says that an outsider to the contract trusts. The trustee has a contract with them, the PMA. The trustee is not the counterparty to our note. Our note is a contract with the issuer. So their interference with our contract, the note, with the issuer, doesn't fall under the rubric of the trustee deciding when to declare a trustee or when to declare a default or having to act under a default. That fits into more sort of the trust action. And thirdly, I would say that they call that the no-action clause. The no-action clause doesn't prevent a direct action where it's otherwise recognized under law. It's simply a restriction on what the trustee can and can't do under the specific terms of the indenture. So we don't think it would apply to our tortious interference claim at all for that reason. When you say that the indenture is incorporated, do you mean you're arguing that the entire indenture is incorporated into the note? I think that it is the rights that belong to the note holder that's incorporated because that's the language that's used in the note. It says the note holder looks at the indenture for all of their rights and all their protections, for example. So I don't know if that means the entire indenture. They certainly didn't argue only the indenture. Isn't that a pretty big question, though? I mean, if we're looking at the intent of the contracting parties, here would be the parties to the note.  I mean, it's pretty important that we know what's being incorporated. And it sounds like it's a little vague. It might be a little vague. I mean, it's a huge indenture. Right. And hundreds of pages. But I think where we would land on that is that to the extent that there's parts of the indenture that don't affect a subordinated note holder, it's probably not incorporated. And so the question, sort of the backup question to that is, well, doesn't the note incorporate the limitation on the trustee's action? It might, but I don't know why that would matter, given that the trustee's ability to act still is only on behalf of the res. That's its role as a trustee. It has nothing to do with our rights vis-a-vis our contractual rights vis-a-vis the note, which is why I was saying I'm not sure that it necessarily changes that specific analysis. I've got ten seconds left in my first amount of allotted time. I think it probably would affect some of the analysis that we have for a fiduciary duty claim. But as we argue, the fiduciary duty claim is a direct action under New York law. It's not waivable. The trustee not acting, again, doesn't preclude my client from acting on behalf on its own interest, especially where it's very clear that whether it's under Cayman Islands law or under New York law, they are a co-trustee and an assistant to a co-trustee. That's what Brigade is. It's the sub-advisor. Their fiduciary duties under New York law lie directly to my client as a beneficiary of the trust. They are managing the trust explicitly for the benefit of note holders like my client. Good morning. May it please the Court. William Adams for ACES Capital Management and Joshua Terry. The District Court correctly dismissed NextPoint's counterclaims, which seek to greatly expand NextPoint's rights that are available to them under the governing documents. I'd like to start with the tortious interference claim, as my friend did. It's absolutely clear, as he conceded, that the claim rises or falls based upon whether the indenture is incorporated into the notes. But before we get there, I want to step back and emphasize the sort of unusual nature of this claim, which I think helps to explain why they had to bring it, cobble it together, basically, from the combination of the note and the indenture itself. NextPoint has no claim to breach of the note itself, because it's undisputed that the trustee and the fund complied with the note. And NextPoint also can't sue for breach of the indenture itself, because it doesn't have the necessary support of the note holders to get around the No Action Clause. They only hold 13 percent of the notes. The other 87 percent of the note holders are expressly on record as not supporting their position. Is it minority before payout that's dependent on the success or failure of this claim? That's correct. But this is a classic case of a minority holders holding up, holding hostage this deal. The only thing that's left to be done is to continue paying out the notes. But they can't do it. We have to hold back. The fund has to hold back money, given the pendency of this litigation. I was just curious about it, but I didn't see it. I may have missed it. But the residual last tranche pool of money to be distributed is roughly how much? Do we know? Around $6 million or so, Your Honor. That's what's left in the deal. And so Mr. A pocket change in your world. And doesn't Mr. Terry have a claim on, I mean, through bankruptcy, he was given control of ACIS, right? And CLO because of the arbitration award he received. Correct, Your Honor. He hasn't been paid on the arbitration award. Right, you're right. So how much money is really left for the non-13% note holders? All the money is left is what I'm told, Your Honor. Of that $6 million for him to be. He's paid through a management fee, my colleague tells me. But ultimately on the torches in the pool. I guess that doesn't really answer my question.  What I'm looking for is what is the pot of money to make the note holders under the note whole and also Mr. Terry's claim, arbitration claim, which I thought he had not been paid on. I'm told that he's being paid through distributions over time. So money is going to the note holders. I see. And it's not going to come out of the $6 million. That's correct. That's correct. I'm sorry. I'm sorry if I said otherwise. But with respect to the torches interference claim, they had to do this gymnastics to be able to try to plead a claim. But New York law is very clear that there has to be essentially an unmistakable intent of the parties to incorporate another document into their own contract. And here there's simply, as the district court found, there's no plain statement of intent to incorporate. We don't even know if it's the full indenture that's incorporated or certain sections that I heard today that may have been incorporated. Neither are certainly on the plain text of the note. And, you know, my friend — So it's the idea that it's not enough that the terms of the note are only understandable in conjunction with the indenture because that's clearly the case, right? Right. You need more than that. I mean, the New York Court of Appeals said you have to have an intent to make the indenture or to make the contract part of the, you know, part of the note here. And there has to be — that was in Washington Park. And certainly annexing a contract is not sufficient. And we know here that the drafters of the ACES VI governing documents knew how to incorporate terms by reference. They do that in the offering circular. That's at A1268. They expressly incorporate by reference the terms of the actual documents where they have a summary of the document. They do that again at A1366, again in the offering circular, where it says that a particular form is incorporated by reference here too. That language is not present in the note. And, in fact, the provision that my friend relies on so extensively in the briefing at A5136-37, which is also reprinted at 918 and 919, says reference is hereby made to the indenture for a statement of the respective rights. It's simply a reference to that document for the rights. There's no express intent to incorporate those rights into the note. And the reason that makes absolute sense, Your Honor, is otherwise it would be a complete negation of the no-action clause. You would just be able to — they would just be able to come and sue on a tortious interference theory without regard to limitations that are in the no-action clause, the 25 percent threshold of which they come nowhere close to meeting. If there are no more questions on the tortious interference claim, I'll turn to the breach of fiduciary duty claim and which — and the other tort claims that follow along with that. The district court was absolutely correct that this is a derivative claim under Kamin law. First step is we're in a non-federal claim, so we're looking at the choice of law rules of the forum state. That's New York. New York directs us to the internal affairs doctrine and the place of incorporation of the — here, the fund. That is at issue. Obviously, it's undisputed. This is a Kamin Island fund. Therefore, you look to Kamin Island law to determine whether the claim is direct or derivative. That makes complete sense because whether something is direct or derivative is an assessment of the corporation's or the fund's, in this case, rights, and it's an assessment of who is authorized to exercise those rights. That's very much in the core of the internal affairs of the corporation. The New York Court of Appeals recognized that. And as was said earlier this year, Kamin Island law reflects the — which says that, you know, if the harm to the investors are just a reflection of the loss to the fund or to the corporation itself, that's necessarily a derivative claim. And as the district court very nicely set out at Special Appendix 27, Note 16, the complaint is replete with allegations that the loss here is simply to ACES VI and all harm that the next point allegedly suffered flowed through from those losses — alleged losses and harm to the — to ACES VI itself. And under Kamin law, it's very clear that that is a derivative claim. This Court in unpublished decision in Druk recognizes much, and also the Southern District in Zohar. So it's a derivative claim, and under Kamin law, because next point is not a shareholder, it cannot pursue those claims derivatively. And even if you were to assume that it was a shareholder or that the notes here have some sort of equity-like features, it still wouldn't be sufficient under Kamin law to present a derivative claim because there's no allegations that are — as to the fraud on the minority exception or the personal rights exception. I would encourage the Court to look in particular at Appendix 9436, Paragraph 2, where it talks about the control that is alleged there is only managerial control. Of course, that's through the Portfolio Management Agreement. There's no actual control over the voting securities of ACES VI, which would allow my next point to satisfy the fraud on the minority exception. And if there was any doubt about any of this, which I hope there isn't, an independent basis to affirm is Rule 30 — Rule 23.1. Next point itself didn't own — concedes that it didn't hold the notes at the time that it sued, and its subsidiary didn't hold the notes at the time that the misconduct allegedly occurred. So that is — means that it fails independently for a lack of pleading. Those requirements under Rule 23.1, which are also substantive portions of Cayman law. We don't think — and if you agree that it's — if a derivative claim, you don't have to reach New York law, it's resolved on that basis. So no further questions. I encourage the Court to affirm. Thank you. Thank you. Help me understand something I'm not entirely sure I followed. Yes, Your Honor. Why are you an equity holder rather than a debt holder? I'm sorry, Your Honor, I didn't hear the question. Why are you an equity holder rather than a debt holder? Your Honor, we don't claim to be an equity holder specifically. What we say is that we're a note holder, a debt holder, but because we're the bottom residuary interest, there's no one that claims any money beyond us. Under the New York Court of Appeals holding an auto, and under just general rules of who has standing to bring a derivative action, we cited cases, I believe, from Cayman Islands and from New York. That gives us standing to bring a derivative action if we needed to have standing to bring a derivative action. Under New York law, the — but we — this was part of our certification motion. If it wasn't clear, auto says we have a direct action because essentially there's this pass-through entity where money is pooled together, and the manager of that money owes the pool of funds of fiduciary duty, but really it's us. It's the people who have claims within that fund. Our money is within that fund that we stand in the shoes as a direct fiduciary under New York law. And that's — so we don't say we're a shareholder. We say we're like a shareholder, which is why Rule 23.1 doesn't apply, because it only applies to shareholders. And it doesn't apply to trusts. It only applies to shareholders of companies. And our argument has been we're the beneficiaries of a trust or we're the note holders of a trust, whether under Cayman Islands law or under — or under New York law. The — going back to the incorporation point, my friend said that there, you know, there has to be an incorporation, an intentional incorporation. He miscites the law. What the law they cited says is that there has to be a specific reference to a document, and then there has to be evidence of the intent to incorporate. And then — and the question is, okay, what did they intend? Well, the document is named, so the fact that it's appended also shows that it was intended to be that document. The note is appended to the indenture. I'm not saying that that by itself is enough for incorporation, but it certainly is great evidence of incorporation. And then when the note says, look to the indenture for your rights, and he says, well, the word that they use is not incorporate, it's reference. Well, why would a note holder be told to look for their rights in an indenture if it's not their rights? According to them, a note holder now has rights that they can never exercise, that they can never redeem, that they can never — they can never go after, which is the thing I opened up with. The position in this entire case has been you have nothing as a note holder. You are lucky to get paid a dime, and if you don't get paid the dime, you think you're going to get paid too bad, so sad. You have to go on your way. That can't be. That's not how New York law works. It's certainly not how the law of equity works. The last thing that I mentioned was that Mr. — that the minority holder is holding this hostage. It's an ironic claim, given that they held this trust hostage and managed it for two extra years to the tune of several million dollars of losses that we have alleged and could now prove if we got back down to a trial. So I think there's a little bit of pot calling the kettle black. Finally, I just — I want to be sure I follow you. And you allege these losses were caused by what? One of the — one section of the losses was caused by the fact that they kept making trades and kept buying longer-lived securities to drag out the life of the trust so that they could manage it for longer, because under the rules that some of the sections that we talked about, the wall test, the wharf test, what those do is create a situation where the collateral manager has to sell everything and give all the money back. But if they start buying improper securities, they can drag the life of the trust out as long as they want to keep managing it, earning their fees, what have you. And that was the beginning of a lot of the fights that happened in the bankruptcy court, actually. And the bankruptcy judge sort of threw up her hand and said, you guys go deal with it, which is why we ended up here. I take it, in this suit, the — each party bears their own legal costs? I believe so, Your Honor, yes. Thank you very much. Thank you both, and we will take the matter under advisement.